**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Nos. 23-191 & 25-12 |
| | ) | Judge Nora Barry Fischer |
| TARIQ LONG, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

### I.  INTRODUCTION

On January 16, 2025, Defendant Tariq Long pled guilty to possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), for conduct occurring on or about May 23, 2023 at Count One of the Indictment at Criminal No. 23-191. (Criminal No. 23-191, Docket No. 103). At that same proceeding, Defendant also waived indictment and pled guilty to possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and possession with intent to distribute a quantity of cocaine base, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C), for conduct occurring on or about October 23, 2022 at Counts One and Two of the Information at Criminal No. 25-12. (Criminal No. 25-12, Docket Nos. 8; 9).

The U.S. Probation Office prepared a Presentence Investigation Report ("PIR") dated April 15, 2025 and calculated Defendant's base offense level as 24, pursuant to Guideline §§ 2D1.1. (Criminal No. 23-191, Docket No. 127 at ¶ 33; Criminal No. 25-12, Docket No. 35 at ¶ 33). After applying separate enhancements pursuant to Guideline §§ 2D1.1(b)(1) and 3C1.2 (the latter of which is not disputed by the parties) and a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1, the Probation Office calculated Defendant's total offense level as follows:

| Guideline | Description | Offense Level |
|:---:|:---:|:---:|
| 2D1.1(c)(8) | Converted drug weight | **24** |
| 2D1.1(b)(1) | Possession of a firearm | **+2** |
| 3C1.2 | Reckless endangerment during flight | **+2** |
| 3E1.1 | Acceptance of responsibility | **-3** |
| **Total Offense Level:** | | **25** |

(*Id.* at ¶¶ 33-42). Despite the parties agreeing to apply a 1-to-1 powder-to-crack ratio, the Probation Office did not calculate Defendant's offense level using the 1-to-1 ratio. (*See id.*). By doing so, Guideline § 2D1.1 produced a higher adjusted offense level than Guideline § 2K2.1 and thus controlled Defendant's offense level calculation as contemplated by the Probation Office. (*See id.*).

Pursuant to the Local Criminal Rules, counsel for the Government and for Defendant each had an opportunity to submit objections to the PIR. On March 27, 2025, the Government filed its Position With Respect to Sentencing Factors, wherein counsel objected to the calculation of Defendant's offense level for several reasons and advised that the Government may seek an upward variance at sentencing. (Criminal No. 23-191, Docket No. 129; Criminal No. 25-12, Docket No. 37). First, the United States Probation Office calculated Defendant's offense level without using a 1-to-1 powder to crack ratio. (*Id.* at 1-2). Second, the Government contends that Defendant's statement to an Assistant U.S. Attorney after the conclusion of his detention hearing justified a 2-level enhancement for obstruction of justice pursuant to Guideline § 3C1.1. (*Id.* at 3). Third, as result of Defendant's alleged obstructionist conduct, the Government would not recommend a 3-level reduction in Defendant's offense level for acceptance of responsibility. (*Id.*).

Similarly, on March 27, 2025, Defendant filed his Position with Respect to Sentencing Factors wherein he lodged objections to the drug quantity set forth in ¶ 30 and the application of the firearm enhancements at ¶¶ 29 and 30 of the PIR. (Criminal No. 23-191, Docket No. 130; Criminal No. 25-12, Docket No. 38). Defendant also advised that he intends to seek a downward variance from the advisory guidelines range because of "the lengthy delay from the onset" of his case at Criminal No. 23-191 and its impact on his "ability to engage in religious practices." (*Id.*).

Thereafter, both parties filed responses to the objections, (Criminal No. 23-191, Docket Nos. 134; 135; Criminal No. 25-12, Docket Nos. 42; 43), and the evidentiary record is complete with the official transcripts of the Detention Hearing before U.S. Magistrate Judge Patricia L. Dodge on February 5, 2025, (Criminal No. 23-191, Docket No. 133; Criminal No. 25-12, Docket No. 41), and the Evidentiary Hearing held by this Court on April 15, 2025, (Criminal No. 23-191, Docket No. 147; Criminal No. 25-12, Docket No. 55), as well as the parties' submissions of post-hearing findings of fact, conclusions of law, and replies to same. (Criminal No. 23-191, Docket Nos. 148; 149; 152; 153; Criminal No. 25-12, Docket Nos. 56; 57; 60; 61). After careful consideration of the parties' arguments and all of the evidence of record, and for the following reasons, the Court sustains the Government's objections and overrules Defendant's remaining objections.

II.  BACKGROUND

A.  *Early Procedural History*

On August 29, 2023, Defendant was indicted for possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), for conduct occurring on or about May 23, 2023. (Criminal No. 23-191, Docket No. 3). At his initial appearance and arraignment before U.S. Magistrate Judge Maureen P. Kelly on November 30, 2023, Defendant had counsel

appointed to represent him, pled not guilty, and waived a detention hearing. (Criminal No. 23-191, Docket Nos. 19; 22; 23; 26). Over the next ten months, Defendant had several counsel withdraw for different reasons, and each time the Court appointed him new counsel. (Criminal No. 23-191, Docket Nos. 17; 18; 36; 37; 43; 44; 47; 48). Notwithstanding, Defendant requested to represent himself and for reasons fully set forth in a previous Memorandum Opinion, this Court granted Defendant's request and appointed stand-by counsel.[1] (Criminal No. 23-191, Docket Nos. 54; 72; 73). From October 25, 2024 through Defendant's plea hearing on January 16, 2025, Defendant represented himself, filed several pretrial motions and supporting briefs, and negotiated a plea agreement with the prosecutor. (*See* Criminal No. 23-191, Docket Nos. 75-82; 104). At his request, the Court scheduled a plea hearing. (Criminal No. 23-191, Docket No. 99; Criminal No. 25-12, Docket No. 4).

### B. Change of Plea and Waiver and Plea Hearing

At the outset of the above-described hearing, Defendant provided a handwritten letter to the Court expressing several concerns with his case, including some which formed the bases for potential pretrial motions. (Criminal No. 23-191, Docket Nos. 102-1; 112 at 3; Criminal No. 25-12, Docket Nos. 7-1; 20 at 3). The Court reviewed Defendant's letter and inquired if he wished to proceed with pleading guilty to the charges at Criminal No. 23-191 and Criminal No. 25-12, pursuant to the plea agreement. (Criminal No. 23-191, Docket No. 112 at 3; Criminal No. 25-12, Docket No. 20 at 3). Defendant indicated that he still wanted to plead guilty but wished "to make [the Court] aware" of the facts because he did not want to commit perjury. (*Id*. at 3-4, 11-12). Given same, the Court continued with the scheduled hearing. (*Id*. at 12-14).

---

[1] The Court notes that before granting Defendant's initial request to represent him, it found Defendant to be competent, conducted a *Faretta* colloquy with him, warned him of the potential penalties if he were convicted, and admonished that representing himself was foolish. (Criminal No. 23-191, Docket No. 72).

The Court found Defendant competent to participate, reviewed the unusual procedural history of this case, and questioned Defendant's wish to continue representing himself. (*Id*. at 15-21). In this regard, the Court reviewed the charges at Criminal No. 25-12 and the potential penalties for same, warned him that self-representation was "unwise," and advised him of his then stand-by counsel's more than 30 years of criminal defense experience. (*Id*. at 22-25). Nevertheless, Defendant insisted on representing himself at the plea hearing, and the Court found that "after consideration of the entire record in this case…and…[Defendant's] answers to all of [its] questions," Defendant knowingly and voluntarily waived his right to counsel as to the additional charges at Criminal No. 25-12. (*Id*. at 25).

The Court next reviewed the terms of the parties' plea agreement. (*Id*. at 33-47; *see* Criminal No. 23-191, Docket No. 104; Criminal No. 25-12, Docket No. 10). To that end, the parties agreed that for the purposes of Guideline § 2D1.1, the quantity and type of controlled substances attributable to Defendant at Criminal No. 25-12 is 31 grams of cocaine base, the Government would advocate for a sentence eliminating the powder-to-crack sentencing disparity and applying a 1-to-1 ratio in the calculation of the guidelines range, and the Government could argue that other drug types and quantities should be included as relevant offense conduct. (*Id*.). The parties did not stipulate to any drug type or quantity at Criminal No. 23-191. (*Id*.). The Government also agreed to recommend a two-level downward adjustment and move for an additional one-level decrease for Defendant's acceptance of responsibility, but "if at any time prior to the imposition of the sentence, the defendant fails to fully satisfy the criteria set forth in U.S.S.G. § 3E1.1, or acts in a manner inconsistent with acceptance of responsibility, the United States will not make or, if already made, will withdraw this recommendation and/or motion." (*Id*.).

During the hearing, Defendant admitted to the Government's factual summary of the evidence against him. (Criminal No. 23-191, Docket No. 112 at 58-62; Criminal No. 25-12, Docket No. 20 at 58-62). The Government proffered:

> For the 23-191 case, on or about the night of May 28 into May 29, 2023, Pittsburgh Bureau of Police officers were patrolling in the Homewood area. An officer used his flashlight to look into a vehicle that was parked the wrong way on a curb. The officer saw a firearm with a magazine protruding from under the driver's seat. He also saw a suspected brick of narcotics in the door panel.
>
> Tariq Long later entered the car on the driver's side. When he drove off, the police conducted a traffic stop. He was arrested. The car was towed to the police station, and a state search warrant was authorized and executed on the car. Recovered under the driver's seat was a loaded Springfield Armory XD40 sub-compact .40 caliber Smith & Wesson, serial number XD491118.
>
> For the 25-12 case, on or about October 23, 2022, PBP officers on patrol in Homewood attempted to initiate a traffic stop on an orange Dodge Charger. The Charger fled from police. The orange Charger was then observed in the middle of the road after being in a head-on collision with another vehicle. Mr. Long exited the driver's seat and fled on foot. Mr. Long was caught and arrested. He was found with [31] grams of crack cocaine on his person. An inventory search revealed a stolen, loaded Glock 33 Gen 4 .357 firearm, serial number YTR836.
>
> Crack cocaine is a schedule II controlled substance. Mr. Long intended to distribute the crack that was on his person.
>
> …
>
> And then for both cases: The two firearms and ammunition in the firearms were manufactured outside of Pennsylvania.
>
> On May 17, 2017, Mr. Long was convicted of a person not to possess a firearm in Court of Common Pleas of Allegheny County in Pittsburgh, Pennsylvania, in case number CP-02-CR-1806-2017. He received a sentence of 11 1/2 to 23 months' imprisonment.
>
> On July 13, 2020, Mr. Long was convicted of carrying a firearm without a license in the Court of Common Pleas of Allegheny County in Pittsburgh, Pennsylvania, in case number CP-02-CR-0000712-2018. He received a sentence of one to two years' imprisonment.

> At the time of the instant offenses, Mr. Long knew he had been
> convicted of an offense for which the maximum term of
> imprisonment exceeded one year and that he was not permitted to
> possession [sic] firearms.

(*Id*. at 59-61).

Defendant then pled guilty to Count One at Criminal No. 23-191 and Counts One and Two at Criminal No. 25-12 and expressed a desire to be released pending sentencing. (*Id*. at 66, 71). The Court directed Defendant to file a formal motion seeking his presentence release, which he later did. (*Id*. at 72). He also asked the Court to reappoint counsel before sentencing, and the Court reappointed stand-by counsel to represent Defendant at the conclusion of the plea hearing. (*Id*. at 21-22, 74). The Government responded to Defendant's formal motion seeking release and the Court referred the matter to U.S. Magistrate Judge Patricia L. Dodge for a detention hearing. (Criminal No. 23-191, Docket Nos. 108; 109; 113; Criminal No. 25-12, Docket Nos. 14; 16; 21).

### C.  Detention Hearing

At the outset of the Detention Hearing, the parties presented argument as to the appropriate standard governing the proceedings, and Judge Dodge concluded that Defendant bore the burden of proof as to presentence release. (Criminal No. 23-191, Docket No. 133 at 2-8; Criminal No. 25-12, Docket No. 41 at 2-8). To meet that burden, he testified on his own behalf and presented several character letters. (*Id*. at 8-19; *see* Criminal No 23-191, Docket Nos. 110; 111; 114; 117; Criminal No. 25-12, Docket Nos. 18; 19; 22; 25). During his testimony, Defendant discussed his familial relationships, work history, disciplinary record while incarcerated, and community ties. (*Id*. at 8-13). On cross-examination, Defendant agreed that he admitted to the factual summary of his offenses during the recent plea hearing. (*Id*. at 13-16). Defendant then, at the Assistant U.S. Attorney's request, reviewed a report prepared by the U.S.

Probation and Pretrial Services Office, which detailed his criminal history, including a 2017 shooting. (*Id*. at 16-18).

On redirect- and recross-examination, Defendant denied having shot at anyone in the last eight years, including in the 2017 shooting. (*Id*. at 18-19). At the conclusion of Defendant's testimony, the Government declined to present any witnesses, including Pittsburgh Police Lieutenant Gino Macioce, who was present at the hearing and prepared to testify about the 2017 shooting and the charged conduct at Criminal No. 23-191. (*Id*. at 19; Criminal No. 23-191, Docket No. 147 at 89; Criminal No. 25-12, Docket No. 55 at 89). As such, the Court proceeded hearing argument from counsel. (Criminal No. 23-191, Docket No. 133 at 19-24; Criminal No. 25-12, Docket No. 41 at 19-24). After reviewing the relevant standards and all the evidence of record, including Defendant's testimony, Judge Dodge denied Defendant's motion for release pending sentencing. (*Id*. at 24-28). Defendant did not appeal or seek reconsideration of the denial of his motion.

### D. *Evidentiary Hearing*

#### 1. Witness Credibility

At the Evidentiary Hearing on April 15, 2025, the Court heard the testimony of ATF Special Agent Johnny Erevia,[2] FBI Special Agent Gregory Battaglia,[3] Pittsburgh Police Lieutenant Gino Macioce,[4] and Defendant Tariq Long.[5] (Criminal No. 23-191, Docket No. 147

---

[2]     ATF Special Agent Erevia has held his current position since July 2022 and was previously employed by the Pittsburgh Bureau of Police as a police officer, bomb technician, and detective for over eight years. (Criminal No. 23-191, Docket No. 147 at 17-18; Criminal No. 25-12, Docket No. 55 at 17-18). While employed by the Pittsburgh Bureau of Police, he worked in Zone 5 and did not recall investigating any previous cases involving Defendant. (*Id*. at 56-57). He also has a bachelor's degree in history. (*Id*. at 56).

[3]     FBI Special Agent Battaglia has over a decade of experience with the FBI, having been a staff operations specialist from December 2012 until becoming a special agent in April 2022. (Criminal No. 23-191, Docket No. 147 at 60; Criminal No. 25-12, Docket No. 55 at 60). He is currently assigned to the Joint Terrorism Task Force. (*Id*.).

[4]     Lt. Macioce has worked for the Pittsburgh Bureau of Police as a police officer, detective, and sergeant until his promotion in August 2024 to lieutenant. (Criminal No. 23-191, Docket No. 147 at 73; Criminal No. 25-12,

at 2; Criminal No. 25-12, Docket No. 55 at 2). The Court also received evidence as to Defendant's underlying offense conduct at Criminal Nos. 23-191 and 25-12. (*Id*. at 18-33). The Court finds the testimony of ATF Special Agent Erevia, FBI Special Agent Battaglia, and Lt. Macioce to be credible, and to the extent, Defendant's testimony contradicts their testimony, the Court credits their testimony.[6] Specifically, the Court finds that Defendant did not testify credibly about allegations of wrongdoing on the part of Lt. Macioce.

### 2. Defendant's Statement at Detention Hearing and Subsequent Investigation

While being escorted out of the courtroom at the end of the Detention Hearing, Defendant whispered to the previously assigned Assistant U.S. Attorney that "I'm going to cook him when I get out," referring to Lt. Macioce.[7] (*Id.* at 61-63, 108). Lt. Macioce did not hear Defendant make this statement, but the then Assistant U.S. Attorney relayed it to him. (*Id* at 91). Defendant did not make any violent or threatening gestures when making the statement, but given Defendant's "brazenness to say that in federal court to a prosecutor" and his history of dangerousness, Lt. Macioce concluded that it was a threat of violence. (*Id*. at 69, 91-92). As a result, Lt. Macioce remains vigilant when in the community but testified that he would not change his testimony based on Defendant's statement. (*Id*. at 92-94).

---

Docket No. 55 at 73). He was a member of the Pittsburgh SWAT team and has completed trainings with Pittsburgh SWAT and outside agencies. (*Id*. at 73-74, 97). He also teaches courses on human behavior and tactical threat recognition across the country through Six Layer Concepts and Consulting. (*Id*. at 73-74, 99). For most of his career, he has worked nights in Zone 5. (*Id*. at 73-74).

[5]      The Court is aware from other proceedings and the PIR that Defendant is 34 years old, graduated from Wilkinsburg High School, attended Community College of Allegheny County, and completed a trimester of criminal justice studies at Mercyhurst University. (Criminal No. 23-191, Docket No. 127; Criminal No. 25-12, Docket No. 35). Prior to his arrest, he had consistently worked as a flagger and would often work part-time jobs during the cold months. (*Id*.; Criminal No. 23-191, Docket No. 147 at 111; Criminal No. 25-12, Docket No. 55 at 111).

[6]      The evaluation of the credibility of the evidence is left to the discretion of the Court. *See United States v. Conde*, 58 F. App'x 538, 539-40 (3d Cir. 2002) (citing *United States v. Whalen*, 82 F.3d 528, 531 (1st Cir. 1996)) ("[T]he District Court was in the best position to determine witness credibility.").

[7]      Lt. Macioce testified that the statement was "something to the effect of I'm going to cook that dude sitting next to you." (Criminal No. 23-191, Docket No. 147 at 91; Criminal No. 25-12, Docket No. 55 at 91). Defendant does not deny that he made the statement or that Lt. Macioce is the person to whom he referred. (*Id*. at 113).

Immediately after making the statement, FBI Special Agent Gregory Battaglia interviewed Defendant. (*Id*. at 60-61). During the interview, Defendant admitted to making the statement and claimed he was going to "cook" Lt. Macioce through community activism and not physical harm because harming Lt. Macioce would be "suicide" for him. (*Id*. at 61-66). Defendant further explained his reasons for engaging in community activism. (*Id*. at 63-65). He claimed that Lt. Macioce had been trying to kill him since 2013 when Lt. Macioce shot at Defendant. (*Id*. at 63-64) Moreover, he accused Lt. Macioce of planting the drugs found in his car in May 2023, having "more bodies" than him, and engaging in other forms of police misconduct in his community. (*Id*. at 63-65). Special Agent Battaglia did not gather any evidence contradicting Defendant's explanation. (*Id*. at 70). At the end of the interview, Defendant professed no hatred for Lt. Macioce, but Special Agent Battaglia did not find his statements to be credible. (*Id*. at 65). Rather, he inferred animosity on the part of Defendant, due to his claims that Lt. Macioce had been slighting him over the last decade. (*Id*.).

Special Agent Battaglia also interviewed Lt. Macioce. (*Id*. at 66-67). Lt. Macioce overheard Defendant make a comment about him when Defendant first entered the courtroom. (*Id*. at 67). He denied shooting at Defendant in 2013 or knowing Defendant was involved in the conduct charged at Criminal No. 23-191 before taking him into custody. (*Id*. at 67). Lt. Macioce told Special Agent Battaglia that he had not encountered Defendant before 2017 when he investigated Defendant for the discharge of a firearm. (*Id*. at 66-67, 75-77). In that incident, after police did not recover a firearm, Defendant told Lt. Macioce to "remember his name," which he believed to be taunting. (*Id*.). A few hours later, a shooting occurred in and around a local market, and Lt. Macioce identified Defendant as one of the shooters seen in a surveillance video, which was admitted into evidence as Government's Exhibit 5. (*Id*. at 75-80). The individual

identified as Defendant by Lt. Macioce is seen holding, firing, and then discarding a firearm. (*Id.* at 80-87). Based on the evidence that he gathered and his experience investigating threats, Special Agent Battaglia concluded that Defendant's statement that he would "cook" Lt. Macioce was a threat on Lt. Macioce's life. (*Id.* at 47, 68).

As a result of Defendant's purported explanation, Lt. Macioce testified about his police record, disciplinary history, and other allegations of police misconduct. Lt. Macioce admitted being involved in five incidents where he discharged his firearm. (*Id.* at 96-98). Each shooting was thoroughly investigated and Lt. Macioce was not charged, though he was sued.[8] (*Id.* at 100-01). Over the last ten years, Lt. Macioce had two or three civilian complaints filed against him from the Homewood area of Pittsburgh. (*Id.* at 104-05). He was either exonerated or the complaints were deemed unfounded. (*Id.* at 105). Neither Defendant nor his family were involved in any of the civilian complaints against him. (*Id.* at 106).

During his testimony, Defendant largely repeated and expanded on the responses which he offered to Special Agent Battaglia during his interview. He testified that he made the statement because he did not want Lt. Macioce to police his community based on prior interactions with him, even though he was not mad or angry at Lt. Macioce. (*Id.* at 108, 117-19). He again accused Lt. Macioce of shooting at him in 2013 and engaging in shoot-outs with others while wearing plain clothes. (*Id.*). In 2017, Defendant was charged with attempted homicide and a weapons violation charge and was identified by Lt. Macioce. (*Id.* at 109). Moreover, he denied that the drugs found in his vehicle at Criminal No. 23-191 belonged to him and accused Lt. Macioce of planting the drugs as well as withholding body camera footage which he believes would demonstrate same. (*Id.* at 109-10). Defendant denied that he had the opportunity to use other words to express his desire to prevent Lt. Macioce from policing his community. (*Id.* at

---

[8]    *See Daniels v. City of Pittsburgh et al.*, No. 22-1790, 2023 WL 2707178, at *1 (3d Cir. Mar. 30, 2023).

113). Defendant acknowledged that he "would love to be out [of jail]" but denied being disappointed when he was not released at his detention hearing. (*Id*. at 113-15). However, he admitted that "if you told me right now I could go home, I'd probably plead guilty to just about anything." (*Id*. at 116). Despite his allegations of misconduct by Lt. Macioce, Defendant has never filed a civil complaint against him. (*Id.* at 119-20).

3. Evidence as to Criminal No. 25-12

On October 23, 2022, Pittsburgh police officers observed an orange Dodge Charger unsafely pass another vehicle. (*Id*. at 18). Police activated their lights and sirens and initiated a traffic stop, but the Dodge Charger fled and eventually crashed into another vehicle. (*Id*. at 18-21). Defendant exited the vehicle and fled on foot with the officers in pursuit. (*Id*. at 19). He was taken into custody nearby and was searched incident to arrest. (*Id*. at 21-22). A woman who had been in the passenger seat left the scene and was not detained. (*Id*. at 21, 25). Police found money, approximately 31 grams of crack cocaine, and the key fob for the Dodge Charger on his person. (*Id*. at 22). The key fob was used to open the glove compartment of the car, where a loaded, semi-automatic pistol was discovered. (*Id*. at 24). The handle was facing the driver's seat, and the firearm itself was accessible to Defendant while fleeing from police as the key fob could be used to unlock the glove compartment while the vehicle was being operated. (*Id*. at 23-24). Additionally, the woman in the passenger seat could have assisted in accessing the firearm. (*Id*. at 25). Based on his training and experience, Special Agent Erevia explained that drug traffickers often carry guns to protect their criminal enterprise and empower or assist them while they are fleeing from police. (*Id*. at 25-26).

4. Evidence as to Criminal No. 23-191

On the night of May 28, 2023, Pittsburgh Police Lt. Gino Macioce and Officer John Abbondanza were patrolling the Homewood neighborhood. (*Id*. at 26). During their patrol, they observed a firearm and a "brick" of narcotics in an empty, parked vehicle. (*Id*.). Lt. Macioce took pictures of the items, which were admitted into evidence as Government's Exhibit 1. (*Id*. at 27). The firearm was underneath the driver's seat with the handle facing the front of the vehicle, and the drugs were in the driver's door pocket. (*Id*. at 28). Police maintained surveillance until the driver of the vehicle returned. (*Id*. at 29). When the driver started to drive away, police initiated a traffic stop and took the driver into custody. (*Id*.). Police identified the driver, who was the sole occupant, as Defendant. (*Id*. at 29-30). A search of his person revealed marijuana, a blue iPhone, and approximately $2,300 in cash, which Special Agent Erevia testified was indicative of drug trafficking based on his training and experience. (*Id*.). Police also searched the car and recovered the loaded, semi-automatic handgun which was previously observed under the driver's seat, the "brick" of narcotics in the driver's side door, a red iPhone between the driver's seat and center console, a partial "brick" of fentanyl and crack cocaine in the center console, multiple scales, including one with white cocaine residue, and evidence associated with Defendant's identity. (*Id*. at 30-33). In the month leading up to this incident, police had also observed Defendant driving the same vehicle. (*Id*. at 33).

Special Agent Erevia determined that each of the iPhones belonged to Defendant and documented his review of Defendant's phones, which was admitted into evidence as Government's Exhibit 2. (*Id*. at 33-35). He concluded that in the weeks leading up to his arrest, Defendant was engaged in drug trafficking. (*Id*. at 34). In support of that conclusion, he testified that several text messages and Cash App transfers were consistent with drug trafficking. (*Id*. at 35-41). Furthermore, the drugs recovered from Defendant's vehicle were analyzed by the

Allegheny County Crime Laboratory, which determined that the drugs were approximately 1.61 grams of fentanyl and 12 grams of crack cocaine. (*Id.* at 41-43).

### III. LEGAL STANDARDS

It is Defendant's burden to make "a timely and substantial objection" to the facts set forth in the PIR. *United States v. Morales-Aponte*, 229 F. App'x. 69, 72 (3d Cir. 2007); *see also United States v. Cyr*, 337 F.3d 96, 100 (1st Cir. 2003) ("Generally, a PSR bears sufficient indicia of reliability to permit the district court to rely on it at sentencing. The defendant is free to challenge any assertions in the PSR with countervailing evidence or proffers, in which case the district court is obliged to resolve any genuine and material dispute on the merits. But if the defendant's objections to the PSR are merely rhetorical and unsupported by countervailing proof, the district court is entitled to rely on the facts in the PSR.") (citations and internal quotation marks omitted). Thus, a defendant must both raise an objection to the PIR and support said objection with proper legal authority or evidentiary support. *Id.*

The Court is tasked with weighing the credibility of the evidence presented by the parties at sentencing. *United States v. Perez*, 386 F. App'x 301, 304 (3d Cir. 2010) (citations omitted). The resolution of factual disputes is governed by the preponderance of the evidence standard. *See United States v. Fisher*, 502 F.3d 293, 304-05 (3d Cir. 2007); *see also* U.S.S.G. § 6A1.3 cmt. n. ("[U]se of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of guidelines to the facts of a case."). Further, "[i]n resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a).

Before the Court may consider commentary to the Sentencing Guidelines, it must determine if the Guideline at hand is ambiguous. *See Kisor v. Wilkie*, 588 U.S. 558 (2019); *United States v. Nasir*, 17 F.4th 459 (3d Cir. 2021) (en banc) (setting forth three-step framework). If a Guideline is unambiguous, then the Court disregards the commentary. *United States v. Mercado*, 81 F.4th 352, 356 (3d Cir. 2023). But, if the Guideline is ambiguous, the Court continues with its analysis and examines whether the commentary is reasonable. *Id*. The commentary is reasonable when it is "within the outer bounds of permissible interpretation" and does not expand the meaning of the instant Guideline. *Id*. (internal quotations omitted); *see also United States v. Banks*, 55 F.4th 246, 258 (3d Cir. 2022) (granting no weight to commentary which expands the definition of the analyzed Guideline). If reasonable, the Court lastly considers whether the commentary implicates the substantive expertise of the Sentencing Commission and "reflects fair and considered judgment." *See id.* (internal quotations omitted). If so, the commentary is entitled to *Auer* deference, i.e., controlling weight. *Id*. Shortly stated, the commentary to the Sentencing Guidelines controls only when a Guideline is ambiguous and it is reasonable, implicates the expertise of the Sentencing Commission, and "reflects fair and considered judgment." *Id*.

IV. DISCUSSION

In sum, the parties dispute the quantity and type of controlled substances attributable to Defendant, whether he possessed a firearm in connection with another felony offense, whether he obstructed justice, and whether he accepted responsibility for his criminal conduct. The Court now considers each of these disputes, in turn.

A. *Quantity and Type of Controlled Substances*

The Court first addresses the parties' stipulation calculating Defendant's base offense level using a 1-to-1 powder-to-crack ratio. It is well established that the Court may accept a stipulation concerning the calculation of the advisory guidelines if the parties present "justifiable reasons" to do so. *See* U.S.S.G. § 6B1.2; *United States v. Bernand*, 373 F.3d 339, 343-45 (3d Cir. 2004). The Court may consider, among other relevant factors, the certainty provided by a plea agreement and the discrepancy from the Sentencing Guidelines caused by the parties' stipulation. *See United States v. Rutherford*, Crim. No. 20-225, 2022 WL 610945, at *2-3 (W.D. Pa. Mar. 2, 2022). Sentencing courts may consider the effects of the crack-powder disparity in sentencing as the Sentencing Guidelines may result in disproportionate sentences that violate the sentencing court's parsimony command. *See Kimbrough v. United States*, 552 U.S. 85, 106-10 (2007).

In this Court's estimation, there are "justifiable reasons" to accept the parties' stipulation to use a 1-to-1 powder-to-crack ratio in calculating Defendant's base offense level. The plea agreement was reached by arm's length negotiations between the parties, with both sides recognizing the inherent risks of continuing to trial. Acceptance of the parties' stipulation will preserve the resources of the parties, the Probation Office, and the Court. Additionally, eliminating the powder-crack disparity for purposes of sentencing is a regular occurrence with reasoned policy rationales. *See United States v. Owens*, Crim. No. 08-48, 2009 WL 2485842, at *2 (W.D. Pa. Aug. 12, 2009) (discussing policy rationales). The Government has supported the elimination of the disparity in other cases and this Court has routinely accepted stipulations eliminating same. *See, e.g.*, *United States v. Andrews*, Criminal No. 21-41, ECF Nos. 71; 83; 106 (W.D. Pa Nov. 13, 2024). In this matter, the application of a 1-to-1 ratio reduces Defendant's total offense level less than it otherwise would because of his guilty pleas at each Count One in

Criminal Nos. 23-191 and 25-12 and the applicability of Guideline § 2K2.1. (*See* Criminal No. 23-191, Docket No. 127 at ¶¶ 29-32; Criminal No. 25-12, Docket No. 35 at ¶¶ 29-32).

By accepting the parties' stipulation and calculating Defendant's offense level using a 1-to-1 powder-to-crack ratio, Guideline § 2K2.1 produces a higher adjusted offense level than Guideline § 2D1.1. As such, the drug quantity disputed by the parties takes on less importance because it will not affect Defendant's offense level. Nevertheless, the Court will proceed to the merits of Defendant's objections pertaining to the amount of controlled substances attributable to him as it is relevant offense conduct.

The sentencing court shall calculate the applicable drug amount based on a defendant's relevant conduct, which includes "all acts…committed…that occurred during the commission of the offense of conviction…." *United States v. Perez*, 280 F.3d 318, 352 (3d Cir. 2002). The quantities must be supported by a preponderance of the evidence. *See United States v. Surine*, 375 F. App'x 164, 169 (3d Cir. 2010).

Here, Defendant admitted to possessing 31 grams of crack cocaine recovered from his person on October 23, 2022, and he does not dispute this quantity. However, he disputes the type and quantity of controlled substances recovered in the May 28, 2023 incident. At the Evidentiary Hearing, the Government introduced a lab report from the Allegheny County Crime Laboratory, revealing that the quantity and type of drugs recovered from Defendant's vehicle on May 28, 2023 were 12.934 grams of cocaine and 1.61 grams of a fentanyl-xylazine mixture. (Criminal No. 23-191, Docket No. 139-1, Ex. 3; Criminal No. 25-12, Docket No. 47-1, Ex. 3). Defendant disavowed possessing these drugs and accused Lt. Macioce of planting them but presented only his testimony in support of that contention. (Criminal No. 23-191, Docket No. 147 at 109; Criminal No. 25-12, Docket No. 55 at 109). The Court does not find his testimony on this issue

to be credible, in light of Lt. Macioce's testimony and Defendant's admission that he was engaged in drug trafficking only eight months earlier and possessed 31 grams of crack cocaine at Criminal No. 25-12.[9] (Criminal No. 23-191, Docket No. 112 at 58-62; Criminal No. 25-12, Docket No. 20 at 58-62). Defendant's text messages and financial transactions leading up to the second arrest also show that he was actively engaged in drug trafficking at that time and further support the credibility of Lt. Macioce's testimony. (Criminal No. 23-191, Docket No. 147 at 35-41; Criminal No. 25-12, Docket No. 55 at. at 35-41). In addition, the Government demonstrated by a preponderance of the evidence that he had dominion and control over the drugs recovered from the center console of his vehicle. *See United States v. Kennedy*, 434 F. App'x 51, 54 (3d Cir. 2011) ("[C]ommon sense counsels that an owner and operator of a vehicle usually has dominion and control over the objects in his or her vehicle….") (internal quotations omitted).

For the foregoing reasons, the Court will accept the parties' stipulation as to the crack-powder ratio but overrule Defendant's objections regarding the quantity and type of controlled substances attributed to him at ¶¶ 30-31 of the PIR.

### B. *Possession of a Firearm in Connection with Another Felony Offense*

Defendant next objects to the 4-level enhancement for possession of a firearm in connection with another felony offense and requests that the Government provide evidence demonstrating same. (Criminal No. 23-191, Docket No. 130; Criminal No. 25-12, Docket No. 38). The Government argues that the enhancement should apply because Defendant possessed firearms which had the potential for facilitating other felony offenses and maintains that Defendant failed to rebut the presumption that the recovered firearms were being used to

---

[9]    *See supra* text accompanying note 6.

facilitate drug trafficking. (Criminal No. 23-191, Docket No. 135; Criminal No. 25-12, Docket No. 43).

Guideline § 2K2.1(b)(6)(B) provides for a four-level enhancement if the defendant "used or possessed any firearm…in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6)(B). Typically, the Government must demonstrate same by a preponderance of the evidence, but when a firearm is recovered in "close proximity" to drugs, Guideline § 2K2.1(b)(6)(B) and Application Note 14(B) create a rebuttable presumption that the four-level enhancement applies. *United States v. Perez*, 5 F.4th 390, 402 (3d Cir. 2021) (holding that Application "Note 14(B) is entitled to *Auer* deference as a reasonable interpretation of an ambiguous Guideline"). A defendant may rebut the presumption by presenting "evidence that the firearm had no relationship to drug-related activities…and thus did not have the potential to facilitate a drug-trafficking offense." *Id*. at 400. For example, firearms possessed accidentally or coincidentally do not have the potential to facilitate drug-trafficking activity. *See id*. at 401-02. As the focus of the inquiry is "whether there is a relationship between the firearm and the defendant's drug-trafficking offense," the sentencing court should consider any relevant evidence, including, the following four factors: "(1) the type of gun involved, with handguns more likely to be connected with drug trafficking than hunting rifles; (2) whether the gun was loaded; (3) whether the gun was stored (or, we add, possessed) near the drugs or drug-related items; and (4) whether the gun was accessible." *Id*. at 401.

After careful consideration of the evidence of record, the Court tentatively finds that the totality of the circumstances in light of each of the four identified factors weigh against determining that Defendant rebutted the presumption that Guideline § 2K2.1(b)(6)(B) applies. The firearms in question were loaded, semi-automatic handguns accessible to Defendant.

(Criminal No. 23-191, Docket No. 147 at 22-34; Criminal No. 25-12, Docket No. 55 at 22-34). The firearm in Criminal No. 23-191 was recovered from under the driver's seat in proximity to the drugs recovered from the center console and driver's door, i.e., either side of the driver's seat. (*Id*. at 27-34). Other documents recovered from the car indicate Defendant had regular access to it, suggesting that it was his firearm. Meanwhile, the firearm in Criminal No. 25-12 was found in the glove box and police recovered the drugs from Defendant's person after he fled on foot. (*Id*. at 22-26). Defendant presented no evidence that possession of the firearms was "accidental or coincidental," and the possession of different firearms and drugs in two distinct interactions with police strongly weigh against such a finding. Moreover, in Criminal No. 25-12, Defendant pled guilty to drug trafficking and possession of a firearm by a convicted felon arising out of the same traffic stop. (Criminal No. 25-12, Docket No. 7).

Altogether, Defendant's possession of firearms in both cases clearly had the potential to facilitate (and, in fact, likely did facilitate) felony drug-trafficking and other felony offenses.[10] As such, the Court overrules Defendant's objection to the four-level enhancement under Guideline § 2K2.1(b)(6)(B).

### C. Obstruction of Justice Enhancement

The Government next objects to the PIR and seeks a 2-level enhancement under § 3C1.1 based on Defendant's attempt to obstruct justice by threatening Lt. Macioce or influencing his testimony at sentencing. (Criminal No. 23-191, Docket No. 129; Criminal No. 25-12, Docket No. 37). Defendant contends, however, that the Government failed to meet its burden in

---

[10]    The Court further agrees with the Government's position that Defendant's possession of the firearms emboldened him to flee from police, itself a possible felony offense. *See* 75 Pa. Cons. Stat. § 3733 (2006). To that end, ATF Special Agent Johnny Erevia testified that in his experience, firearms encourage actors to engage in illegal conduct. (Criminal No. 23-191, Docket No. 147 at 25-27; Criminal No. 25-12, Docket No. 55 at 25-27). The Court concludes that Special Agent Erevia's experience is consistent with its own observation that firearms often embolden bad actors to engage in other illegal and dangerous conduct. In fact, this Court often speaks to this observation at sentencing.

demonstrating that he willfully obstructed justice. (Criminal No. 23-191, Docket Nos 149; 152; Criminal No. 25-12, Docket Nos. 57; 60).

As noted, it is the Government's burden to prove the applicability of an enhancement under Guideline § 3C1.1 by a preponderance of the evidence. *United States v. Helbling*, 209 F.3d 226, 250 (3d Cir. 2000) (citing *United States v. Belletiere*, 971 F.2d 961, 965 (3d Cir. 1992)). Guideline § 3C1.1 provides that:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1. The Court of Appeals for the Third Circuit has held that Guideline § 3C1.1 is unambiguous and instructed district courts to therefore disregard the commentary notes.[11] *United States v. Freeman*, No. 23-2869, 2024 WL 4442038, at *2 (3d Cir. Oct. 8, 2024); *see United States v. Mercado*, 81 F.4th 352, 356 (3d Cir. 2023).

For Guideline § 3C1.1 to apply, the defendant must act with the specific intent to willfully obstruct or impede justice. Willful, as used in Guideline § 3C1.1, is defined "as acting consciously ('deliberately or intentionally') with the purpose of obstructing justice, as opposed to 'negligently, inadvertently, or accidentally.'" *United States v. Soto*, 122 F.4th 503, 509 (3d Cir. 2024). The record need not contain direct evidence of defendant's intent, and district courts often infer willfulness from circumstantial evidence. *See id*. at 508-09. For example, in *Bush v. United*

---

[11]    The commentary notes explain that "[t]his adjustment applies if the defendant's obstructive conduct (A) occurred with respect to the investigation, prosecution, or sentencing of the defendant's instant offense of conviction, and (B) related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) an otherwise closely related case, such as that of a co-defendant." U.S.S.G. § 3C1.1. cmt. n.1. The Guidelines suggest a non-exhaustive list of the types of conduct covered by this provision which may include: "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so"; "committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction"; and "providing materially false information to a judge or magistrate judge." *Id.* at cmt. n.4(A), (B), and (F).

*States*, a defendant's letter in which he wrote to his wife, "I will get that prosecutor…," was intercepted by Bureau of Prisons staff, who believed it to be a threat, despite the defendant's contention to the contrary. *Bush v. United States*, 94 F. App'x 101, 102-03 (3d Cir. 2004). The Court of Appeals was convinced that the statement could reasonably be construed as a threat and thus determined that the district court did not err in imposing an obstruction of justice enhancement. *Id*. at 103.

Yet, while district courts may infer willfulness from a defendant's behavior, the "appropriateness" of the behavior is only one consideration as not all inappropriate behavior "creates an inference of [willful] intent." *See Soto*, 122 F.4th at 509-10. In *Soto*, the defendant inappropriately interacted with jurors and victims. *Id*. at 506-07. Initially, the defendant entered an elevator with two jurors and asked them to press an elevator button for him. *Id*. Thereafter, he approached victims scheduled to testify and greeted them. *Id*. The Court concluded that the district court should not have applied an enhancement pursuant to Guideline § 3C1.1 because it inferred willfulness *solely* from defendant's inappropriate behavior. *Id*. at 509-10. The defendant's behavior was "not enough to support an inference that he willfully intended to obstruct justice, and courts simply cannot read 'obstruction' into such everyday interactions without more than what appears on this record." *Id*. at 511. In sum, in the absence of direct evidence of intent, courts must consider the totality of a defendant's actions and words in evaluating a defendant's specific intent to obstruct or impede justice, or lack thereof.

In this Court's estimation, the Government proved by a preponderance of the evidence that Defendant's statement about Lt. Macioce to the Assistant U.S. Attorney present with him in the courtroom was a willful attempt to obstruct justice. Unlike the defendant in *Soto*, Defendant had no legitimate purpose for whispering any statement to an Assistant U.S. Attorney at the

conclusion of his Detention Hearing, especially as Defendant was being escorted out of the courtroom by two Deputy U.S. Marshals after an adverse ruling. (Criminal No. 23-191, Docket No. 147 at 62; Criminal No. 25-12, Docket No. 55 at 62).[12] Defendant's statement could hardly be considered an "everyday interaction." *See Soto*, 122 F.4th at 511. Rather, his statement focused on a Government witness, who had been present to testify about Defendant's criminal history and offense conduct at Criminal No. 23-191. (*Id* at 89-90). Lt. Macioce testified that he likely would have been a witness at Defendant's sentencing and the Court has no reason to doubt this due to his investigation of the offense charged at Criminal No. 23-191, the parties' ongoing disputes about the drugs in that case, and his prior interactions with Defendant. (Criminal No. 23-191, Docket No. 147 at 75-87, 93; Criminal No. 25-12, Docket No. 55 at 75-87, 93). Given these disputes, Defendant likely knew or should have known before whispering his statement to the Assistant U.S. Attorney that Lt. Macioce could be a witness against him at sentencing. Moreover, Defendant purposefully spoke in such a way that Lt. Macioce could not hear him, thereby attempting to conceal his statement and intent.

Further, Lt. Macioce and Special Agent Battaglia believed Defendant's statement to be a threat, despite his own contention that he intended to engage in community activism. (*Id*. at 91); *see United States v. Carter*, 293 F. App'x 954, 957 (3d Cir. 2008) (district court appropriately considered victim's interpretation of a defendant's statement in imposing obstruction of justice enhancement). Even if Defendant planned to make complaints about Lt. Macioce, the Court believes his warning of potential community activism against Lt. Macioce is itself an attempt to unlawfully influence a potential witness through an implied quid pro quo. *See United States v. Schneider*, 910 F.2d 1569, 1570 (7th Cir. 1990) ("Most threats are conditional; they are designed

---

[12]    In fact, upon reviewing the video of the Detention Hearing, the Court was surprised that a detained defendant was permitted to approach the Assistant U.S. Attorney handling his cases.

to accomplish something…"). Regardless, the Court does not credit Defendant's explanation that it was his intent to engage in community activism because Defendant had not previously engaged in any community activism related to Lt. Macioce or otherwise provided any evidentiary support for his explanation.[13]

For the foregoing reasons, the Court finds that the preponderance of the evidence weighs in favor of the Government's contention that Defendant willfully attempted to obstruct justice by attempting to threaten or influence Lt. Macioce. As such, the Court tentatively sustains the Government's objection and finds that a 2-level enhancement pursuant to Guideline § 3C1.1 should be imposed.

### D.  Acceptance of Responsibility

Having found that an obstruction of justice enhancement pursuant to Guideline § 3C1.1 is appropriate, the Court turns to Defendant's claimed acceptance of responsibility. The Government contends that the application of an obstruction of justice enhancement pursuant to Guideline § 3C1.1 "precludes him from receiving a reduction in his offense level." (Criminal No. 23-191, Docket Nos. 148; 153; Criminal No. 25-12, Docket Nos. 56; 61). Defendant argues that he sufficiently demonstrated acceptance of responsibility by pleading guilty. (Criminal No. 23-191, Docket Nos 149; 152; Criminal No. 25-12, Docket Nos. 57; 60). The parties each approvingly cite the commentary of the U.S. Sentencing Guidelines in arguing their positions. (*See* Criminal No. 23-191, Docket Nos. 148; 149; Criminal No. 25-12, Docket Nos. 56; 57).

Guideline § 3E1.1(a) permits a two-level decrease in Defendant's offense level if he clearly demonstrates acceptance of responsibility. U.S.S.G. §3E1.1(a); *United States v. Mercado*, 81 F.4th 352, 356 (3d Cir. 2023). "[T]he defendant bears the burden of proving by a

---

[13]    Although the Court has no evidence that Defendant has brought a complaint against any police officer, the Court acknowledges that Defendant completed a trimester of criminal justice studies at Mercyhurst University, represented himself in this matter, and thus appears to have the capacity to bring a complaint against Lt. Macioce,

preponderance of the evidence that he has accepted responsibility and a departure is warranted." *United States v. Owens*, 796 F. App'x 69, 72 (3d Cir. 2019). "Clearly demonstrating acceptance of responsibility requires a genuine show of contrition," and a defendant who pleads guilty is not automatically entitled to the deduction. *United States v. Muhammad*, 146 F.3d 161, 168 (3d Cir. 1998); *see United States v. Dullum*, 560 F.3d 133, 142 (3d Cir. 2009).

Application Note 4 to Guideline § 3E1.1 directly addresses the application of the Guideline §§ 3C1.1 and 3E1.1 in concert and is entitled to *Auer* deference as the Third Circuit Court of Appeals has held that Guideline § 3E1.1(a) is ambiguous, the commentary is reasonable and invokes the substantive expertise of the Sentencing Commission. U.S.S.G. § 3E1.1 cmt. n.4; *Mercado*, 81 F.4th at 359; *see also United States v. Thompson*, No. 22-11501, 2023 WL 3596434, at *2 (11th Cir. May 23, 2023) (per curiam) ("The guideline does not define what constitutes 'acceptance of responsibility,' much less state that pleading guilty is sufficient to receive the reduction."). Application Note 4 states: "Conduct resulting in an enhancement under § 3C1.1…ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply." U.S.S.G. § 3E1.1. cmt. n.4.

Defendant does not contest the reasonableness of Application Note 4, nor would any opposition be successful. The Sentencing Commission is "optimally positioned to opine on what factors indicate that a defendant has or has not accepted responsibility for his past criminal activity," including whether his decision to willfully obstruct justice demonstrates genuine remorse. *Mercado*, 81 F.4th at 359-60. Hence, Defendant's post-plea conduct is particularly relevant to "whether he has genuinely accepted responsibility for his crime of conviction," especially when those actions amount to obstruction of justice. *Id*. at 354.

Although Application Note 4 is applicable to the instant action, the Court notes that these cases are atypical. Defendant, while acting as his own counsel, negotiated a plea agreement with the Government. (Criminal No. 23-191, Docket Nos. 102; 104; Criminal No. 25-12, Docket Nos. 7; 10) As a result of that agreement, Defendant waived indictment in another criminal case and pled guilty to both cases, exposing himself to greater penalties. With that said, the Court does not find these cases to be extraordinary such that §§ 3C1.1 and 3E1.1 should each apply. *See United States v. Lessner*, 498 F.3d 185, 199 (3d Cir. 2007) (applying *Hopper* test to determine if a case is extraordinary for purposes of Guideline § 3E1.1); *United States v. Hopper*, 27 F.3d 378, 383 (9th Cir. 1994) (holding that "the relevant inquiry for determining if a case is an extraordinary case within the meaning of Application Note 4 is whether the defendant's obstructive conduct is *not inconsistent* with the defendant's acceptance of responsibility.") "Cases in which obstruction is not inconsistent with an acceptance of responsibility arise when a defendant, although initially attempting to conceal the crime, eventually accepts responsibility for the crime and abandons all attempts to obstruct justice." *Id*. The Court has extensively detailed its reasons for finding that Defendant's conduct was intended to obstruct justice, which, in this case, does not indicate an acceptance of responsibility.

Moreover, acceptance of responsibility is inconsistent with contesting relevant offense conduct that the court concludes is accurate while offering only unsubstantiated and trivial evidence. *See United States v. Saggese*, 209 F. App'x 217, 219 (3d Cir. 2006); *see also* U.S.S.G. § 3E1.1 cmt. n.1(a) ("A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility, but the fact that a defendant's challenge is unsuccessful does not necessarily establish that it was either a false denial or frivolous.").

26

To that end, Defendant's testimony at the detention and evidentiary hearings demonstrates his lack of acceptance of responsibility. First, he failed to take responsibility for the drugs attributed to him, instead accusing Lt. Macioce of planting the drugs without presenting any evidence supporting same. (*Id*. at 63-65). Second, at his detention hearing, which was related to the instant cases, Defendant denied being involved in the 2017 shooting. (Criminal No. 23-191, Docket No. 133 at 18-19; Criminal No. 25-12, Docket No. 41 at 18-19). However, the Court had the opportunity to review surveillance video of the shooting, accepts Lt. Macioce's identification of Defendant in the video, and does not credit Defendant's denial of involvement. His disavowal only strengthens the Court's conclusion that Defendant lacks genuine contrition for the instant criminal conduct.

Accordingly, Defendant has failed to prove by a preponderance of the evidence that his actions clearly demonstrate genuine contrition or acceptance of responsibility for his criminal conduct. Thus, the Court will sustain the Government's objection and will not reduce Defendant's offense level for acceptance of responsibility.

V.  CONCLUSION

For the foregoing reasons, the Court sustains the Government's objections related to the calculation of Defendant's offense level, overrules Defendant's objections to the type and quantity of controlled substances attributable to him and a four-level enhancement for possession of a firearm in connection with another felony offense, imposes a two-level enhancement for obstruction of justice, and finds that Defendant has repudiated his acceptance of responsibility. The Court will separately issue its Tentative Findings and Rulings and a presentence order establishing other deadlines.

_/s Nora Barry Fischer_
Nora Barry Fischer
U.S. District Judge

Date:    June 24, 2025

cc/ecf:  All counsel of record.

Tariq Long c/o Damien Schorr, Esq.